PER CURIAM.
We have for review a referee’s report recommending that William Bedford Watson, III, be found guilty of professional *917 misconduct and suspended from the practice of law for ninety days. We have jurisdiction. See art. V, § 15, Fla. Const. We approve the referee’s findings of fact. For the reasons discussed herein, we disapprove the referee’s recommendation that Watson be found not guilty of violating Rule Regulating the Florida Bar 4-8.4(c). We find that Watson is guilty of three violations of the rule. We approve the referee’s recommendations that Watson be found guilty of four violations of rule 5-1.1(b). We disapprove the referee’s recommended sanction of a ninety-day suspension and instead impose a three-year suspension, effective, nunc pro tunc, October 1, 2009.[1]
FACTS
The Florida Bar filed a disciplinary complaint, with four counts, alleging that Respondent Watson engaged in financial transactions that violated the Rules Regulating the Florida Bar. The Bar contended that Respondent engaged in misconduct involving dishonesty, fraud, deceit, or misrepresentation in disbursing third-party funds from his trust account and that he did not apply the funds he held in trust to the specific purpose for which they were intended.
Count I addressed a transaction involving Steven Hooks, asserting violations of rules 4-8.4(c) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation) and 5-l.l(b) (money or other property entrusted to an attorney for a specific purpose is held in trust and must be applied only to that purpose). Count II alleged a violation of rule 5-1.1(b) based on a transaction involving Karl Brown. Count III presented a transaction involving Marian Reid, asserting violations of rules 4-8.4(e) and 5 — 1.1(b). Count IV alleged a violation of rule 5 — 1.1(b) based on a transaction involving Brandon Bury. A referee was appointed who held hearings and submitted a report to the Court making the following findings and recommendations.
Phil Walton, Jason Meyer, and Navin Subramaniam-Xavier. Respondent has provided legal services to Phil Walton numerous times since 2002 or 2003. According to testimony, Walton makes his living through commercial transactions that assist individuals in obtaining financing for projects.
Jason Meyer is a developer. In 2007 and 2008, Meyer requested Walton’s assistance in obtaining a “financing device” that they referred to as a “standby letter of credit.” The witnesses were not consistent in explaining how this financing device was supposed to function in their situation, but testimony indicates it was sought to assist Meyer in funding a development project. As Meyer was having difficulty obtaining the standby letter of credit, Walton suggested that Meyer contact Respondent, who had experience handling “international transactions, transactional funding, and large real estate projects.” Report of Referee at 2-3. In January 2008, Meyer asked Respondent to represent him in seeking the standby letter of credit. Respondent accepted the responsibilities, although he never personally met Meyer — all of their contact was by telephone or email.
Respondent determined that a standby letter of credit had been issued but had not been funded. In an effort to obtain funding, Meyer asked Walton to seek aid from Navin Subramaniam-Xavier, who *918 was in Florida working as a commodity trader and investor. Based on the testimonies, Meyer needed to raise money to serve as collateral that would convince a bank to issue a standby letter of credit. Thus, Meyer was seeking investors to place their funds into an account, which would serve as the demonstrated collateral. It was determined that the investors’ funds would be held in Respondent’s trust account. The investors were informed that their monies would be returned to them, with exceptional interest, within a few days.
Meyer introduced Respondent to Subra-maniam-Xavier during a telephone conversation. Subsequently, Respondent and Subramaniam-Xavier had numerous telephone conversations throughout January 2008 concerning Subramaniam-Xavier’s potential investment in Meyer’s project. Respondent told Subramaniam-Xavier that these types of transactions were secure.
Previously, Subramaniam-Xavier had acted as a mortgage broker for Brown. Subramaniam-Xavier asked Brown about Respondent’s reputation and credentials. Brown determined that Respondent was an AV rated lawyer with a good reputation.
Thereafter, Subramaniam-Xavier obtained $400,000 from his uncle, who lived in Singapore, to partially fund Meyer’s project. On January 14, 2008, Subraman-iam-Xavier and Meyer signed a contract that Subramaniam-Xavier had prepared. The agreement specifically provided that Subramaniam-Xavier’s funds would be held in Respondent’s trust account. In return for their investment, Subraman-iam-Xavier and his uncle would be paid the entire principal of $400,000, plus the substantial additional amount of $300,000, within 48 hours. Respondent did not have any role in the negotiations or preparation of the contract.
On January 15, 2008, Subramaniam-Xa-vier transferred the $400,000 into Respondent’s trust account. That same day, Respondent wrote a letter to Subramaniam-Xavier that acknowledged the agreement, and he had a telephone conversation with Subramaniam-Xavier regarding the funds. During this conversation, Subramaniam-Xavier told Respondent that the funds could be released from the trust account and disbursed according to Meyer’s instructions. This oral agreement was confirmed by email messages between Respondent and Subramaniam-Xavier.
Following instructions from Meyer, Respondent disbursed the funds from his trust account. Even though Subraman-iam-Xavier did not receive the payments as agreed in the contract, neither he nor his uncle complained about the transaction.[2]
Steven Hooks. Hooks is an investor and financial consultant in Texas. He understood that Meyer was in the process of *919 securing funds for a development project in Arizona. They had numerous telephone conversations, some of which included Respondent. The terms of the eventual agreement, however, were negotiated by Hooks and Meyer. Respondent was not involved with the negotiations.
Hooks understood from Meyer that for his investment of $300,000, Hooks would receive a return of $600,000 within 48 hours. Hooks thought his funds would remain in Respondent’s trust account and not be disbursed without his permission. He concluded that Respondent was an independent escrow agent and not Meyer’s lawyer.
On January 16, 2008, Respondent wrote and emailed Hooks a letter with copies sent to Meyer and Walton, which Respondent calls a “disbursement letter.” Respondent testified that he prepared this letter based on his understanding of the transaction. Hooks received the email and believed that it accurately reflected the transaction, especially the point that his funds would remain in Respondent’s trust account. However, a few hours after receiving the email, Meyer made handwritten changes to it and transmitted the revised copy by email to Hooks and Respondent. Hooks denies receiving this changed version of the email. Respondent confirms that he received the changed version, but admits that he did not communicate with Hooks regarding the changes.
On January 22, 2008, Hooks transferred $300,000 into Respondent’s trust account. The next day, Respondent, acting upon Meyer’s instructions, disbursed those funds. When Hooks learned that the money was gone, he made an effort to recover his funds, both through Meyer and Respondent. Meyer repaid Hooks only about $72,000 of the $300,000.
Karl Brown, Marian Reid, and Brandon Bury. Subramaniam-Xavier was contacting other individuals to convince them to invest with Meyer. As part of this recruitment effort, Meyer asked Walton to prepare written material that he could show to prospective investors. On January 28, 2008, Walton prepared material that mentioned Respondent’s law firm, stating in part: “This is an excellent opportunity for an investor no risk and Watson & Watson -will provide a letter of undertaking to the lender that payment will be effected from the first disbursement from the transaction that is being funded.”
Subramaniam-Xavier again approached Brown, this time asking him to invest in Meyer’s project. Subramaniam-Xavier told Brown that there was little risk because the funds would remain in Respondent’s trust account. Brown spoke with Respondent by telephone prior to investing his money, explaining that he was concerned whether the financial transactions were part of an illegal scheme and that he did not want the money being released to Walton. Respondent assured Brown that he had handled many of these types of transactions before and that Brown’s funds would remain in Respondent’s trust account. Brown understood that he would receive a 25% profit on his investment in a very short time with little risk. On January 31, 2008, Brown deposited $46,000 into Respondent’s trust account. Also, Brown spoke with his friends, Richard Lawson and Brandon Bury, regarding the promised financial transaction.
During this time, Respondent was asked by Subramaniam-Xavier or Walton to prepare letters to five possible investors. Respondent prepared the letters, which were on his letterhead, signed by him, dated February 1, 2008, and addressed to Brown, Lawson, Bury, Azim Ramlize, and Lashon *920 Toyer.[3] The letters suggested that the five investors had already provided their funds for the project. Respondent sent the letters by email to Subramaniam-Xavier. Although Respondent had already signed and dated the letters, he claims the letters were not supposed to be distributed to the addressees until after they had deposited funds into his trust account.
Lawson spoke with his mother, Marian Reid, who is a nurse, about these financial transactions. He told Reid that if she invested, her funds would be secure because Subramaniam-Xavier had assured him that the money would remain in Respondent’s trust account. Lawson showed Reid the five letters. After seeing the signed and dated letters, Reid believed that the addressed individuals were investing. Reid understood that she would receive a profit of 25% on her investment. On February 1, 2008, she deposited $100,000 into Respondent’s trust account.
Brown discussed the investment with Bury, who is self-employed operating a swimming pool chemical business. Bury understood that the funds were to remain in Respondent’s trust account and that he would receive a 25% return on his investment. On January 30, 2008, Bury deposited $50,000 into Respondent’s trust account.
Respondent disbursed all of the funds received from Brown, Reid, and Bury on February 4, 2008, acting on Meyer’s instructions. Respondent did not seek permission from any of them before disbursing their monies.
On February 29, 2008, Respondent wrote letters to Brown and Reid, stating that there was a delay in the transaction, but did not state that the funds had been transferred. After some time passed, Brown contacted Respondent to ask about the transaction. At that point, Brown learned that the funds had been transferred from Respondent’s trust account.
Brown, Reid, and Bury made efforts to get their money back, but they did not recover anything. Brown, Reid, Bury, and Hooks have asserted that Respondent is responsible to them for transferring their funds out of his trust account.
Respondent’s Financial Benefits and Credibility. Respondent received $25,000 from Meyer, which Respondent asserts is a portion of his earned attorney’s fees. Respondent claims that Meyer owes him additional payment for his legal services. Otherwise, Respondent claims he received no financial benefit from the financial transactions or investments.
The Bar’s auditor noted that Respondent’s trust account was in compliance with record-keeping rules, but he could not offer an opinion as to whether the funds were utilized for the intended purposes. Whether Respondent violated the applicable rules is an issue of credibility. Respondent claims that he never agreed to hold the investors’ funds in his trust account. The investors say he did. The referee evaluated the evidence and found Respondent not credible.
Considering the large sums of money involved, it is inexplicable that the agreements were not placed in writing. The referee determined that the absence of documentation supported the investors’ assertions that they believed their funds were secure in a lawyer’s trust account.
Also, Respondent wrote the letter to Hooks on January 16, 2008, stating that the money would be held in trust. Re *921 spondent asserts that he wrote the letter based on what Hooks told him of the transaction. Thus, the letter is evidence that Hooks understood that the funds would be held in trust and that Hooks communicated that belief to Respondent. Although Respondent knew that Meyer later changed Respondent’s letter, Respondent did not communicate with Hooks about the differences between Hooks’ and Meyer’s views of the transaction.
Respondent’s February 6, 2008, letter to Brown, and February 29, 2008, letters to Brown and Reid, led them to believe that their funds were to remain in Respondent’s trust account. However, the funds had been disbursed by the time Respondent wrote the letters and he did not disclose that fact. Further, Subraman-iam-Xavier adamantly testified that the investors always understood that their funds were to remain in Respondent’s trust account.
In addition, Respondent wrote and signed the five letters to potential investors on February 1, 2008. He then gave the letters to Subramaniam-Xavier. Respondent knew the letters were incorrect and there was potential for their misuse because the letters falsely indicated that the five recipients were contributing their funds to Meyer’s project. Also, the letters created a sense of security and suggested to potential investors that a lawyer, Respondent, was handling their funds.
Respondent argues that Meyer was his client. Thus, it is incomprehensible why Respondent prepared the five letters pursuant to directions from Subramaniam-Xavier and Walton. Further, when Respondent was asked why he used his trust account for these transactions, he eventually stated that it was to make the investors feel secure that they would receive their profits.
Recommendations as to Guilt. Respondent asserted that he did not have any duty to the investors, arguing that his loyalty was to his client, Meyer. Respondent claimed that once the funds were deposited into his trust account, he was responsible only to Meyer, not to Hooks, Brown, Reid, or Bury. Contrary to Respondent’s arguments, the referee found by clear and convincing evidence that Respondent was obligated to hold the funds delivered by Hooks, Brown, Reid, and Bury in his trust account without disbursing them, and that his failure to do so violated rule 5 — 1.1(b) (a lawyer must hold property of others with the care required of a professional fiduciary). The referee recommended that Respondent be found guilty of violating rule 5-1.1(b) for counts I through IV.
Next, the referee found that the Bar did not prove that Respondent engaged in misrepresentation to Hooks or to Reid, as alleged in counts I and III. The referee found that Respondent acted negligently and, thus, did not intend to engage in misrepresentation. The referee recommended that Respondent be found not guilty of violating rule 4-8.4(c).
Disciplinary Recommendations. The referee considered disbarment, but found that Respondent’s conduct was not deliberate and intentional. Also, Respondent did not use the victim’s funds for his own benefit — rather, he was careless in disbursing their funds. On this basis, the referee recommended the sanction of a ninety-day suspension, effective nunc pro tunc, October 1, 2009, the date of Respondent’s current emergency suspension. In addition, the referee recommended that Respondent be placed on probation for three years following the suspension. The referee awarded costs to the Bar in the amount of $10,266.49.
*922 With regard to aggravating factors, the referee found: (a) there was a total of four victims in two separate transactions (multiple victims); (b) Respondent has not acknowledged any wrongdoing; and (c) Respondent has substantial experience in the practice of law because as he has practiced for over forty years and has expertise in handling commercial transactions.
As to mitigating factors, the referee found that Respondent (a) has no prior disciplinary record; (b) did not have a dishonest or selfish motive because he acted negligently or carelessly; (c) made an effort to have the funds returned to the victims; (d) cooperated with the Bar’s audit of his trust account and had a cooperative attitude toward these proceedings; and (e) has outstanding legal and personal character reputations.
On Review. The Florida Bar sought review of the referee’s report. The Bar challenges the referee’s recommendations, asserting that (1) the referee’s findings that Respondent was negligent are unsupported, since the facts show that Respondent’s misconduct was deliberate or knowing; and (2) the referee’s recommended discipline of a ninety-day suspension is not supported by case law.
ANALYSIS
Deliberate or Knowing Conduct. First, The Florida Bar challenges the referee’s finding that Respondent acted negligently. The Bar asserts that Respondent deliberately or knowingly engaged in misconduct, and provides specific facts to support its claims. On review, the examination of this issue requires two steps.
The referee’s finding that Respondent did not have the necessary intent is a factual finding, which must be upheld if there is competent, substantial evidence in the record to support it. Fla. Bar v. Nicnick, 963 So.2d 219 (Fla.2007); Fla. Bar v. Forrester, 818 So.2d 477 (Fla.2002). However, in Florida Bar v. Fredericks, 731 So.2d 1249 (Fla.1999), the Court repeated the well-established principle that “in order to satisfy the element of intent it must only be shown that the conduct was deliberate or knowing.” Id. at 1252; see also Nicnick, 963 So.2d at 223-24; Fla. Bar v. Brown, 905 So.2d 76, 81 (Fla.2005); Fla. Bar v. Barley, 831 So.2d 163, 169 (Fla.2002). The motive behind the attorney’s action is not the determinative factor. Rather, the issue is whether the attorney deliberately or knowingly engaged in the activity in question. Fla. Bar v. Riggs, 944 So.2d 167, 171 (Fla.2006); Fla. Bar v. Brown, 905 So.2d at 81; Fla. Bar v. Smith, 866 So.2d 41 (Fla.2004); Fla. Bar v. Lanford, 691 So.2d 480, 481 (Fla.1997). Thus, if the record shows that Respondent deliberately or knowingly engaged in the acts, his conduct was intentional.
Next, the standard of review for recommendations as to guilt in disciplinary cases is as follows: The Court has repeatedly stated that the referee’s factual findings must be sufficient under the applicable rules to support the recommendations as to guilt. Fla. Bar v. Shoureas, 913 So.2d 554, 557-58 (Fla.2005). In this case, the referee’s finding that Respondent was negligent is the crucial issue. If the evidence shows that Respondent intentionally engaged in the misconduct, he is guilty of violating rule 4-8.4(c).
The February 1, 2008, Letters That Respondent Wrote to Toyer and Ramlize. The record shows that Respondent prepared letters on his letterhead, dated February 1, 2008, addressed to Brown, Lawson, Bury, Toyer, and Ramlize. The letters indicated that these five individuals had invested money in Meyer’s project. Respondent admits to this conduct. He signed the letters and provided them to *923 Subramaniam-Xavier, who then used the letters in an effort to recruit other investors. These are facts, supported by competent substantial evidence in the record.
The letter of undertaking addressed to Toyer indicated that he had invested $25,000 in the project. The letter of undertaking addressed to Ramlize indicated that he had invested $69,000 in the project. The record shows that when Respondent drafted and signed these letters, neither Toyer nor Ramlize had invested any money into the project. Respondent is responsible for managing his trust account— these two individuals never deposited any money into his account. When Respondent signed the letters and provided them to Subramaniam-Xavier, he knew that Toyer and Ramlize had not invested their money. We find that the letters were dishonest.
Respondent asserts that his conduct regarding the letters cannot be found dishonest unless the Bar shows that someone relied on the letters. We disagree. Deceitful conduct does not have to be successful in order to be found dishonest.
Next, Respondent deliberately or knowingly engaged in the conduct of authoring, signing, and providing the dishonest letters to Subramaniam-Xavier. Thus, his conduct satisfies the element of intent. See Fla. Bar v. Fredericks, 731 So.2d 1249 (Fla.1999). Respondent is guilty of violating rule 4-8.4(c).
Respondent Refused to Provide the Investors with Information Regarding Their Money. After Respondent transferred the funds out of the trust account, investors asked Respondent to inform them of the status or location of their funds. Hooks, Brown, and Reid engaged in repeated and significant efforts to ascertain the facts from Respondent. He would not provide them with any truthful information. In fact, the record shows that Respondent told Reid that the funds were in the account, even though he had transferred them. Eventually Reid retained counsel, who sent Respondent a written demand for an accounting. Respondent refused to provide an accounting for the funds. Similarly, Respondent did not disclose the true events to Hooks, even though Hooks had traveled from Texas to meet with Respondent in Florida. Further, although Respondent transferred the funds out of his account on February 4, 2008, he wrote letters to Brown and Reid on February 29, 2008, asserting that there had been a delay in the transaction but he did not inform them that the funds had been transferred. These dishonest acts are clearly set forth in the record and are supported by competent substantial evidence.
Respondent asserts that Meyer was his client, so he was prohibited from providing the investors with the requested information. Respondent’s argument is misguided. He owed a fiduciary duty to Hooks, Brown, Reid, and Bury. As the comment to rule 5-1.1 states, “A lawyer must hold property of others with the care required of a professional fiduciary.” In Florida Bar v. Ward, 599 So.2d 650 (Fla. 1992), the Court addressed this responsibility, stating that lawyers have a “unique fiduciary duty,” individually and as a profession. “Never is an individual’s trust in attorneys more evident, or more at risk, then when he places funds or property into the hands of his attorney.” Id. at 652 (quoting Philip F. Downey, Comment, Attorneys’ Trust Accounts: The Bar’s Role in the Preservation of Client Property, 49 Ohio St. L.J. 275, 275 (1988)); see also Fla. Bar v. Martinez-Genova, 959 So.2d 241 (Fla.2007). As explained in Florida Bar v. Joy, 679 So.2d 1165 (Fla.1996), lawyers often hold funds in escrow where their client is one principal and a non-cíient is *924 another principal party. By undertaking to do so, the lawyer establishes a new legal relationship with the principal parties either by an expressed agreement or by an agreement implied in law. The relationship that is established is one of principal and agent, in which the lawyer is an agent of, and owes a fiduciary duty to, all of the principals. Absent a written agreement, the law implies that the attorney will know the conditions of the principals’ agreement and will exercise reasonable skill and ordinary diligence in the holding and delivering of the escrowed funds in accordance with that agreement. Id. at 1167.
Since Respondent deliberately or knowingly, and repeatedly, refused to provide the investors with forthright information regarding their funds, his conduct demonstrates that he acted with intent. Respondent is guilty of violating rule 4-8.4(c).
Whether Respondent Assured Hooks That His Money Would Stay in Respondent’s Trust Account, Then Transferred the Money Without Authorization. The Bar asserts that Respondent acted deliberately or knowingly with regard to the transfer of Hooks’ funds. We agree. Respondent emailed Hooks a letter, dated January 16, 2008, which plainly stated:
This will also confirm I will hold your funds in my Trust Account until I am able to send you the $600,000.00, and, if I am not able to send you the $600,000.00 within 48 hours after receipt of your funds, I will return your funds to you.
Shortly thereafter, despite having assured Hooks that he would maintain the funds in his trust account, Respondent deliberately and knowingly disbursed the funds. Further, he did not seek Hooks’ permission to disburse Hooks’ money. The referee found that Respondent transferred the funds without Hook’s permission, for which the referee recommended finding that Respondent violated rule 5-1.1(b) (money or other property entrusted to an attorney for a specific purpose is held in trust and must be applied only to that purpose). These facts are supported by competent substantial evidence in the record, which includes documents and testimonies.
Based on these same facts, we find that Respondent acted with intent when he transferred the funds and is therefore guilty of violating rule 4-8.4(c).
Discipline. Second, the Bar argues that the referee’s recommended discipline of a ninety-day suspension, effective, nunc pro tunc, on the date of Respondent’s emergency suspension, followed by three years of probation, is not supported by the Florida Standards for Imposing Lawyer Sanctions and case law. Respondent asserts that the referee’s recommended sanction is appropriate. In reviewing a referee’s recommended discipline, this Court’s scope of review is broader than that afforded to the referee’s findings of fact because, ultimately, it is our responsibility to order the appropriate sanction. See Fla. Bar v. Anderson, 538 So.2d 852, 854 (Fla.1989); see also art. V, § 15, Fla. Const. However, generally speaking, this Court will not second-guess the referee’s recommended discipline as long as it has a reasonable basis in existing case law and the Florida Standards for Imposing Lawyer Sanctions. See Fla. Bar v. Temmer, 753 So.2d 555, 558 (Fla.1999).
At the outset, the referee’s recommendation of probation does not contain any terms or conditions for the probation. The Bar states that it is a nullity, as there is nothing to enforce. We agree, and hereby disapprove the recommendation of probation.
Next, the Bar argues that the appropriate sanction is a three-year suspension. *925 The Bar asserts that Respondent should be required to demonstrate proof of rehabilitation because he is a danger to the public and cannot be trusted. Fla. Bar v. Berman, 659 So.2d 1049 (Fla.1995) (disapproving a recommended ninety-day suspension for the intentional misuse of third-party trust funds, and imposing a six-month suspension requiring proof of rehabilitation prior to reinstatement); see also Fla. Bar v. Whigham, 525 So.2d 873 (Fla. 1988) (suspending respondent for three years for commingling trust funds and violating recordkeeping rules, even though no client complained, no money was missing, and there was no financial injury). Respondent significantly injured four individuals by contributing to the loss of their funds, an extremely large amount of funds, which he had promised to keep secure in his trust account.
Respondent had a fiduciary duty to the individuals who placed their funds in his trust account. In Florida Bar v. Joy, 679 So.2d 1165 (Fla.1996), the Court stated that lawyers often hold funds in escrow under circumstances in which one principal is a client and the other principal party is not a client. By doing so, the lawyer establishes a new legal relationship with the principal parties either by an expressed agreement or by an agreement implied in law. Id. at 1167. The relationship that is established is one of principal and agent, where the lawyer/agent owes a fiduciary duty to all of the principals. Id. Absent an express agreement, the law implies that the attorney will know the conditions of the principals’ agreement and will exercise reasonable skill and ordinary diligence in holding and delivering the es-crowed funds according to the agreement. Id. at 1167. Respondent clearly had a duty to the four individuals, and he violated that responsibility.
Further, in Florida Bar v. Hall, 49 So.3d 1254, 1259 (Fla.2010), the Court held that “[ejven though Respondent was not acting in a formal attorney-client relationship, she was still a member of The Florida Bar and bound by its ethical rules.” Like the respondent in Hall, Respondent misused his status as an attorney to harm members of the public. He caused these individuals to believe that their funds would be safe in his attorney trust account, yet he intentionally disbursed their funds without their knowledge or consent. Respondent’s flagrant misuse of his position as an attorney, by which he purposefully lulled members of the public into thinking their funds would be safe in his account, merits a severe sanction. See Fla. Bar v. Hosner, 520 So.2d 567, 568 (Fla.1988) (“[Ljawyers are necessarily held to a higher standard of conduct in business dealings than are nonlawyers.”).
Respondent deliberately or knowingly engaged in these improper acts. We find that Respondent is guilty of three violations of rule 4-8.4(c), in addition to the referee’s recommendation of four violations of rule 5 — 1.1(b). We do not view violations of rule 4-8.4(c) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation) as minor. The Court has clearly stated that “basic, fundamental dishonesty ... is a serious flaw, which cannot be tolerated,” Fla. Bar v. Rotstein, 835 So.2d 241, 246 (Fla.2002), because dishonesty and a lack of candor “cannot be tolerated by a profession that relies on the truthfulness of its members.” Id. (quoting Fla. Bar v. Ko-rones, 752 So.2d 586, 591 (Fla.2000)); see also Fla. Bar v. Head, 27 So.3d 1, 8 (Fla. 2010). Considering this principle, the egregious nature of Respondent’s misconduct clearly outweighs the mitigation.
The respondent in Florida Bar v. Riggs, 944 So.2d 167 (Fla.2006), engaged in mis *926 conduct regarding client funds, committed acts involving dishonesty and misrepresentation, and violated trust account requirements. In part, he failed to properly manage his trust accounts, including real estate funds, and a paralegal allegedly stole some of the account funds. Riggs, like Respondent, asserted that his actions were negligent and not intentional. The Court found Riggs’s actions were deliberate and knowing and met the element of intent, and found him guilty of violating rule 4-8.4(c). Like Respondent, he was also guilty of violating rule 5-l.l(b). Riggs argued for a ninety-day suspension. The Court imposed a three-year suspension. The Court stated:
It is well settled that the misuse of funds held in trust is one of the most serious offenses a lawyer can commit and that disbarment is presumed to be the appropriate sanction. Fla. Bar v. Travis, 765 So.2d 689, 691 (Fla.2000); see also Fla. Bar v. Tillman, 682 So.2d 542 (Fla.1996). However, there are cases involving attorney misconduct relating to client funds in which the attorneys were disciplined by lengthy suspensions instead of disbarments. See Fla. Bar v. Whigham, 525 So.2d 873 (Fla. 1988) (three-year suspension). In light of the facts of this case, a lengthy suspension is the appropriate sanction.
Riggs, 944 So.2d at 171. Respondent, like Riggs, did not properly fulfill his responsibilities as an attorney in managing his trust account. He did not exercise the necessary care and discretion. Instead, he allowed Meyer to direct him in handling the funds of Hooks, Brown, Reid, and Bury. This is similar to Riggs permitting his paralegal to handle the trust account, without Riggs’s proper management. See also Fla. Bar v. Whigham, 525 So.2d 873 (Fla.1988) (a lawyer’s gross negligence in managing a client trust account, absent willful misappropriation of client funds, warranted a three-year suspension).
In light of Riggs and Whigham, we disapprove the referee’s recommended discipline of a ninety-day suspension because it does not have a reasonable basis in existing case law. Based on case law and Respondent’s egregious misconduct, we conclude that a three-year suspension is the appropriate sanction.
CONCLUSION
Accordingly, we approve the referee’s findings of fact and award of costs. We disapprove the referee’s recommendation that Respondent be found not guilty of violating rule 4-8.4(c). We find Respondent guilty of three violations of rule 4-8.4(c). We approve the referee’s other recommendations as to guilt. Further, we disapprove the referee’s recommendation of a ninety-day suspension. William Bed-ford Watson, III, is hereby suspended from the practice of law for three years, effective, nunc pro tunc, October 1, 2009. As Respondent is currently suspended, it is unnecessary to provide him with thirty days to close out his practice to protect the interests of existing clients. William Bed-ford Watson, III, shall fully comply with Rule Regulating the Florida Bar 3-5.1(g). Further, Watson shall accept no new business from the date this opinion is filed until he is reinstated.
Judgment is entered for The Florida Bar, 651 East Jefferson Street, Tallahassee, Florida 32399-2300, for recovery of costs from William Bedford Watson, III, in the amount of $10,266.49, for which sum let execution issue.
It is so ordered.
CANADY, C.J., and PARIENTE, LEWIS, QUINCE, POLSTON, LABARGA, and PERRY, JJ., concur.

. On September 1, 2009, the Court issued an order imposing an emergency suspension on Respondent. See Fla. Bar v. Watson, 18 So.3d 529 (Fla. Sept. 1, 2009). Respondent is still under an emergency suspension, which commenced in October 2009.

. Subramaniam-Xavier testified that after the funds were transferred out of the account, Meyer called him and stated that Meyer could pay the $700,000 as agreed. Instead of taking the $700,000, Subramaniam-Xavier and his uncle decided to accept $125,000 from Meyer and reinvest the difference with him. In addition, Subramaniam-Xavier decided to invest $150,000 of his own funds. Further, Subramaniam-Xavier began recruiting other investors because Meyer offered to pay him a "commission.” Meyer directly sent Subra-maniam-Xavier a $75,000 commission, without going through Respondent. At one point in his testimony, Subramaniam-Xavier stated that he received $11,000 as another commission. Subramaniam-Xavier later testified that the $11,000 was not a commission but was money that was owed to him. Subra-maniam-Xavier also testified that he was to receive a ten-percent commission for the "Brown, Bury, and Reid deal.”

. Subramaniam-Xavier thought Ramlize and Toyer would participate in this venture, but they did not. As these two did not participate, there is scant evidence in the record about them.