PER CURIAM.
We have for review a referee’s report regarding alleged ethical breaches by Sherry Grant Hall. We have jurisdiction. See art. V, § 15, Fla. Const. For the reasons discussed herein, we disapprove the referee’s recommended sanction of a ninety-day suspension and instead disbar Hall.
FACTS
The Florida Bar filed a disciplinary complaint alleging that Respondent Hall violated several of the Rules Regulating the Florida Bar. A referee was appointed. After holding hearings, the referee submitted a report to the Court in which she made the following findings and recommendations.[1]
*1255 In late 2000, Respondent approached property owners Irving Godwin and Clara Godwin, a married couple, seeking to lease a portion of their pasture for Respondent’s horses. After negotiations, Respondent went to the Godwins’ home, bringing a pre-prepared lease agreement for a portion of the land. On January 21, 2001, the lease agreement was signed at the God-wins’ home. At that time, the parties discussed the possibility that the Godwins might sell Respondent the pasture land and the remaining property. Respondent wrote, by hand, an addendum on the lease that was then signed by the Godwins, Respondent, and witness Joseph Grant.[2] The handwritten addendum stated:
Hall and Godwin agreed that Hall would obtain an appraisal, at her costs, by the end of March. The parties will thereafter negotiate an agreement for Hall to purchase the pasture, the mobile home park and the Godwin residence, with time frames for such purchase to be at the election of Godwin and to be specified, along with this specific price(s), and a contract to be executed by those parties subsequent to this lease. (Emphasis added.)
Two copies of the paperwork were prepared and signed by all parties. The God-wins kept the copy with the handwritten addendum and Respondent retained a fully signed copy without the addendum. Respondent maintained her notes regarding the addendum (which she wrote during the discussion) and the signed lease in a file at her home.[3]
After Respondent received a property appraisal of $88,000, she offered to purchase the land. The Godwins refused her offer. Thereafter, the Godwins obtained an appraisal that was for a higher amount, approximately $115,000 to $139,500, which Respondent refused to pay. Nevertheless, over the next several months, Respondent continued to contact the Godwins asking them to sell the property to her. In communications with the Godwins and realtors involved in attempting to sell the property, Respondent continually insisted that she had “an agreement to purchase the property as opposed to an agreement to negotiate a price for the property.”
In 2003, two years after the parties signed the lease agreement, Respondent suddenly produced a letter that included a document titled “Lease Agreement and Agreement for Sale.” (Emphasis added.) Respondent asserted that this document was signed by the Godwins, Respondent, and witness Joseph Grant, on January 21, 2001, (the date the lease agreement was signed at the Godwins’ home). Further, Respondent had recorded this fraudulent “Lease Agreement and Agreement for Sale” in the county clerk’s office on December 12, 2002. This fraudulent document had an additional typed paragraph, which was not in the Godwins’ copy of the document. The additional paragraph stated that the parties shall thereafter “negotiate a time for conveyance of the property” to Respondent and added the words “Agreement for Sale ” to the first page of the document. (Emphasis added.)
*1256 Three forensic document examiners reviewed the Lease and Agreement for Sale document, in which the typed language was different from the handwritten language. All three examiners concluded that the signatures of Mr. and Mrs. God-win and witness Grant were forged. Only Respondent’s signature was genuine.
The State Attorney’s Office charged Respondent with two felonies — grand theft and uttering a forged instrument (the fraudulent recording of the Lease Agreement and Agreement for Sale). In August 2006, Respondent entered into a Deferred Prosecution Agreement (DPA) in which she agreed, among other things, to (1) quitclaim any interest in the Godwins’ property to give them clear title to the property within forty-eight hours of signing the agreement; (2) pay the Godwins $15,000 in restitution; (3) acknowledge in writing that the existing lease between Respondent and the Godwins was null and void; (4) vacate the pasture land and relinquish any rights she might have had under the lease; (5) execute any documents necessary to eliminate any cloud on the title of the Godwins’ property l-esulting from the lease; and (6) ensure that all sub-tenants or other persons occupying the pasture under Respondent’s lease would vacate the property. In September 2006, the criminal charges were dismissed because Respondent had complied with the requirements of the DPA.
The Bar’s disciplinary complaint charged Respondent with violating Rules Regulating the Florida Bar 3-4.3, Misconduct; 4-1.7(b), Conflict of Interest General Rule (2005); 4-1.8(a) and (b), Conflict of Interest Prohibiting Transactions; 4-1.9(b), Conflict of Interest Former Client; 4-1.16, Declining or Terminating Representation; 4-8.1, Bar Admission Disciplinary Matters; 4 — 8.4(c), Misrepresentation; and 4.8.4(d), Conduct Prejudicial to the Administration of Justice. The referee recommended that Respondent be found guilty of violating only rule 4-8.4(c) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation).[4] The referee made this recommendation based on the following findings.
I find that Hall changed the title of the document from Lease to Lease and Agreement for Sale and added additional language to the lease. In these days of computers it would have been impossible for Hall to take the signed agreement back to her office and make it “look good” by typing in the language. A signed and fully executed agreement could not have had a paragraph added without either handwriting it or with the use of a typewriter. The changed Lease and Agreement for Sale was prepared again by computer with a changed title and a changed addendum and three forged signatures.
[[Image here]]
Hall admitted that she deliberately and intentionally changed the title of the document and that she intentionally changed language from the hand-written addendum to the printed language. This made a substantial change in the content of the document and Hall did this for her own benefit. She argues that since her. signature on the forged document was genuine, she must have signed it in the process of signing multiple other documents and did not realize what she had done and that some unnamed person in her office must have forged the other three signatures. This strikes the Referee as incredulous since *1257 there is no benefit for office staff to have forged signatures. Additionally, [Hall] stated that she did not have a regular assistant to do clerical work for her but that the lawyers did their own typing and in fact, she had prepared this agreement on her home computer and that she did not have a file in the office and that 90-95% of her legal work was performed at her home. The witness Joseph Grant as well as Mrs. Godwin testified that the hand-written language placed on the document that she retained was also added on to the second document retained by Mrs. Hall. Although there is no proof beyond a reasonable doubt that [Hall] actually forged the signatures, there is no doubt that her signature is genuine and this is a factor to be considered. A fraud was committed when the name of the document was changed and the language was changed from the original document.
With regard to aggravating factors, the referee found:
A troubling aspect of this case is that Hall attempted by means of numerous letters, phone calls and visits to the God-wins to achieve her goal of purchasing the property at a price she desired to pay.
Hall didn’t notify anyone of the changed terms until February 2003 and continued to insist that she had an agreement to purchase the property not merely what could be considered as a possible option to purchase.
As to mitigating factors, the referee found that Respondent, who has been -a member of The Florida Bar since 1986, has no prior disciplinary history. Also, “Hall ... is well respected in her community as an honest, hard working loyal friend involved in numerous community and church activities to the betterment of others.”
Before the referee, the Bar sought the disciplinary sanction of disbarment. The referee did not discuss any case law, but considered Florida Standard for Imposing Lawyer Sanctions 7.2.[5] After considering Standard 7.2 and the mitigating factors, the referee recommended a ninety-day suspension. The referee awarded costs to the Bar in the amount of $20,160.71.
The Florida Bar seeks review of the referee’s recommended sanction of a ninety-day suspension, arguing that a three-year suspension or disbarment is appropriate. In her answer brief, Respondent asserts that the appropriate sanction is a suspension of no more than ninety days.[6]
ANALYSIS
In reviewing a referee’s recommended discipline, this Court’s scope of *1258 review is broader than that afforded to the referee’s findings of fact because, ultimately, it is the Court’s responsibility to order the appropriate sanction. See Fla. Bar v. Anderson, 538 So.2d 852, 854 (Fla.1989); see also art. V, § 15, Fla. Const. However, generally speaking, this Court will not second-guess the referee’s recommended discipline as long as it has a reasonable basis in existing case law and the Florida Standards for Imposing Lawyer Sanctions. See Fla. Bar v. Temmer, 753 So.2d 555, 558 (Fla.1999).
The referee’s report and the record demonstrate that Respondent purposefully used her knowledge of the law to harm others, for her own personal benefit. Her actions, as the referee stated at the hearing, were harassment.
After the signing of the Lease Agreement, Respondent contacted Mrs. Godwin with a price for the property. When the Godwins did not accept Respondent’s offering price, and Respondent rejected their counter-offer, Respondent began a lengthy process of harassment and abuse of the legal system. Respondent began misrepresenting to Mrs. Godwin that the original Lease Agreement was an agreement to sell the property to Respondent. Mrs. Godwin maintained that according to the advice of her own attorney, she was not required to sell Respondent the property under the Lease Agreement.
Nevertheless, Respondent continued to harass Mrs. Godwin about selling her property. Mrs. Godwin’s daughter, Cindy Godwin, testified that in June 2002, Respondent returned to the Godwins’ home and again claimed that she had an agreement to buy their property and that she wanted to discuss it with Mrs. Godwin. Cindy told Respondent that her mother was represented by counsel and her mother was not to have any conversations with Respondent about selling the property.
Despite being informed that the God-wins were represented by counsel, Respondent called their home several hours later and again asked to speak with Mrs. Godwin. Cindy, who answered the telephone, again told Respondent to speak with their lawyer. Cindy testified that Respondent threatened to sue the Godwins and tie them up in court, insinuating that they could lose their property from protracted litigation, and insisting that the Godwins had to sell the property to her. When Respondent resumed making offers for the Godwins’ property, Cindy testified that she again told Respondent to contact their lawyer or their real estate agent. The referee considered these events as aggravating factors, as Respondent attempted by means of numerous letters, phone calls, and visits to the Godwins to achieve her goal of purchasing the property at a price she desired to pay.[7]
When Mrs. Godwin decided to list her property for sale in May 2002, she hired a realtor. The realtor stated on the real estate listing agreement that a sale was subject to a lease agreement, which would have included Respondent’s lease agreement. Nevertheless, Respondent continued her misconduct — by seeking to drive away any possible contenders for the property. Respondent wrote a letter to the realtor, dated June 19, 2002, misrepresenting to him that she had a contract with the *1259 Godwins to purchase their property. The realtor testified that Respondent spoke with him on the phone, stating that the Lease Agreement was actually an agreement for her to purchase the Godwins’ property and that he could not sell the property. He also testified that Respondent threatened to report him to the real estate commission and have his license revoked if he sold the Godwins’ property. In light of these events, the realtor was directed by his realty agency to withdraw the Godwins’ real estate listing on June 21, 2002.
On January 20, 2003, the Godwins’ attorney wrote Respondent advising her that the Godwins had no obligation under the Lease Agreement to sell her the property. On February 21, 2003, Respondent wrote to the Godwins’ attorney, again misrepresenting that the Godwins had agreed to sell her the property. At that point, Respondent provided for the first time a copy of the fraudulent Lease Agreement and Agreement for Sale that she had previously recorded in December 2002 at the clerk’s office. Thereafter, in a letter dated June 11, 2003, the Godwins’ attorney requested that Respondent execute a quitclaim deed to remove the cloud from the Godwins’ title and return it to his office within two weeks. Respondent did not comply with this request for over three years.
In fact, Respondent did not properly address matters until after she was criminally charged with forgery and uttering a forged instrument. At that point, she was required to sign a quitclaim deed as part of her DPA. She finally complied with the request to execute a quitclaim deed on August 10, 2006, which was three years after the Godwins’ attorney asked her to remove the cloud from the title. During that entire period of time, the public was misled by the fraudulent recording in the clerk’s office, and the official recording lent credence to Respondent’s misrepresentations. By her deliberate actions, Respondent put a cloud on the title of the Godwins’ property and prevented them from selling it.
Respondent’s brazen misrepresentations and continual harassment distinguish this case from other forgery cases. Although the referee found only one rule violation, Respondent’s misconduct is egregious. Her misrepresentations caused the Godwins to lose two buyers for their property. Respondent’s threats to the Godwin’s realtor caused him to withdraw the Godwins real estate listing. Due to Respondent’s continued harassment, the Godwins were forced to hire an attorney to defend themselves. Even though Respondent was not acting in a formal attorney-client relationship, she was still a member of The Florida Bar and bound by its ethical rules. Respondent misused her status as an attorney to harm the God-wins: (1) by recording the fraudulent document in the clerk’s office, in order to tie up the Godwins’ property; (2) by asserting that the Godwins and their realtor would suffer for not complying with her legal claims; and (3) by forcing the God-wins to hire counsel to resolve the legal problems that Respondent created. Even after being informed that the Godwins had hired counsel, Respondent continued to directly harass them. This Court does not look favorably on those who use their standing as an officer of the court to deliberately harm others — especially when they intentionally hurt members of the public for their own personal gain. Further, in the instant case, Mr. and Mrs. Godwin were seniors, and Mr. Godwin was suffering from Alzheimer’s disease. Respondent was preying upon this vulnerable couple.
*1260 Respondent put pressure on the God-wins by sending letters, making phone calls, and visiting them, in an effort to achieve her goal of purchasing the property. Further, Respondent continuously misrepresented to third parties that she had a contract for sale, when she knew, or should have known as an attorney, that she had no contractual right to purchase the Godwins’ property. Based on this evidence, the referee orally pronounced from the bench that Respondent “violated the rules of the Bar by harassing lots of people.”
Further, Respondent deliberately and intentionally engaged in felonious conduct by recording the fraudulent Lease Agreement and Agreement for Sale in the county clerk’s office. As a lawyer, Respondent knew or should have known that the recording of this instrument in the clerk’s office was a felony (uttering a forged document). By the terms of the original agreed-upon paragraph, Respondent should have known that she did not have an agreement to purchase the land. Nevertheless, Respondent recorded the fraudulent document in the clerk’s office to misrepresent to the public at large that she had a right to purchase the Godwins’ property. By recording the fraudulent document, Respondent placed a cloud on the title of the property she desired, which impeded the Godwins from selling or transferring the property to anyone else. It is apparent that Respondent committed these misdeeds for her own benefit, in an effort to secure the property.
As for the fraudulent document, Respondent admitted that she deliberately changed the title of the document. In addition, the referee found that she intentionally changed language from the handwritten addendum to the typed language. Respondent’s alterations substantially changed the meaning of the legal document. Despite the evidence, in an attempt to avoid guilt, Respondent claims that some unknown person in her office must have forged the other three signatures. Thus, she asserts that she did not create the forgery. The referee found this testimony unbelievable. Additionally, Respondent testified that she did not have a regular assistant to do clerical work for her— the lawyers in her firm did their own typing. In fact, Respondent prepared this agreement on her home computer, she did not even have a file in the firm’s office, and she stated that 90-95% of her legal work was performed at home. The facts indicate that no one, except Respondent, had the motive or opportunity to forge the Godwins’ and Grant’s signatures on the fraudulent Lease Agreement and Agreement for Sale. Yet Respondent insists on her blatant and shameful efforts to blame some unidentified firm employee for forging the three signatures. See Fla. Bar v. Massari, 832 So.2d 701, 703 (Fla.2002) (where respondent produced a forged document allegedly signed by his client and no direct proof was presented as to who forged the document, the referee found that respondent was “the only person who had motive and reason” for creating the forgery). The forensic document examiners stated that of the four signatures, the only authentic one is Respondent’s signature. Further, the four signatures were made with the same pen. See Fla. Bar v. Cohen, 908 So.2d 405, 411 (Fla.2005) (approving “the referee’s use of common sense and logic in making his factual findings based on the evidence presented,” as respondent’s version of events “strains credulity”). The instant referee found that the document Respondent recorded was fraudulent. Like the respondents in Mas-sari and Cohen, Respondent’s assertion belies the evidence.
*1261 Next, Respondent employed numerous tactics to prevent the Godwins from selling their property to anyone else, which included abusing the legal system by recording the forged document and then basing her claims to the property on that fraudulent document. Thus, even though these matters were the personal business affairs of Respondent, and not professional matters involving clients, her conduct establishes a pattern of “flagrant and deliberate disregard for the very laws which [Respondent] took an oath to uphold.” Fla. Bar v. Lord, 433 So.2d 983, 986 (Fla.1983). Further, Respondent’s actions “evade[d] the proper functioning of the legal system[, which] has been found to constitute clearly dishonest conduct that adversely reflects on a lawyer’s fitness to practice law.” Fla. Bar v. Cohen, 908 So.2d 405, 411 (Fla.2005). The Court expects “members of The Florida Bar to conduct their personal business affairs with honesty and in accordance with the law.” Fla. Bar v. Baker, 810 So.2d 876, 882 (Fla.2002); see also Fla. Bar v. Hosner, 520 So.2d 567, 568 (Fla.1988) (“[Lawyers are necessarily held to a higher standard of conduct in business dealings than are nonlawyers.”). Respondent’s flagrant abuse of the law demonstrates a serious character flaw and merits a severe sanction.
The referee recommended that Respondent be found guilty of a single violation of rule 4-8.4(c) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation). Respondent emphasizes that she violated only one rule, by her personal conduct which was unconnected to the practice of law. However, her misconduct was not one isolated incident of fraudulently changing the title and language in a written legal agreement. She engaged in ongoing, continuous misrepresentations for several years. From 2001 until August 2006, when Respondent was required to quitclaim the Godwins’ property back to them pursuant to the DPA, Respondent continued to misrepresent to the Godwins, the public at large, real estate agents, and the Godwins’ attorney that she had a verifiable agreement to purchase the Godwins’ property. At no point in these events has Respondent been contrite.
Further, with regard to violations of rule 4-8.4(c), the Court has clearly stated that “basic, fundamental dishonesty ... is a serious flaw, which cannot be tolerated,” Fla. Bar v. Rotstein, 835 So.2d 241, 246 (Fla.2002), because dishonesty and a lack of candor “cannot be tolerated by a profession that relies on the truthfulness of its members.” Id. (quoting Fla. Bar v. Kornes, 752 So.2d 586, 591 (Fla.2000)). In the instant case, the referee found that Respondent deliberately and intentionally changed the title of the “Lease Agreement” to “Lease Agreement and Agreement for Sale.” In addition, the referee specifically found that Respondent made the “substantial change to the content of the document ... for her own benefit.” Respondent has demonstrated fundamental dishonesty throughout these events.
Although Respondent was not found guilty of criminal acts due to the DPA,[8] she engaged in dishonest and fraudulent conduct in her personal affairs, which demonstrates that she failed to maintain personal integrity. Standard 5.1, “Failure to Maintain Personal Integrity,” and its sub *1262 divisions apply to this case. Standard 5.1 provides:
Absent aggravating or mitigating circumstances, and upon application of the factors set out in Standard 3.0, the following sanctions are generally appropriate in cases involving commission of a criminal act that reflects adversely on the lawyer’s honesty, trustworthiness, or fitness as a lawyer in other respects, or in cases with conduct involving dishonesty, fraud, deceit, or misrepresentation. ...
(Emphasis added.) Standard 5.11 provides that disbarment is appropriate when:
b. a lawyer engages in serious criminal conduct, a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or theft; or
[[Image here]]
f. a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyers fitness to practice.
Thus, pursuant to Standard 5.11, disbarment is an appropriate sanction in this case.
Case law also supports disbarment. In Florida Bar v. Gross, 896 So.2d 742, 746-47 (Fla.2005), the Court disbarred a respondent who had misappropriated from a client trust account on numerous occasions, failed to defend a client in a lawsuit, and repeatedly engaged in forgery. While the Court noted that disbarment is the appropriate sanction for misuse of client funds, the Court also stated:
Additionally, this case also involves other conduct that is extremely troubling, including the forgery of a judge’s signature on two orders, the forgery of a client’s signature on a guilty plea, and the forgery of a client’s signature on a check so Gross could deposit the funds of the check and use them for his own personal means. These acts alone can also constitute independent grounds for disbarment.
Id. at 746-47 (emphasis added). Further, in Florida Bar v. Kickliter, 559 So.2d 1123, 1124 (Fla.1990), the Court held that even with substantial mitigation, disbarment was warranted for a respondent who had forged his client’s signature on a will (the client had died without signing the will), and then submitted the forged document to a court. Kickliter was found guilty of violating several Bar rules. Significantly, Kickliter, like the present Respondent, violated rule 4-8.4(c).
Next, Florida Bar v. Solomon, 589 So.2d 286, 287 (Fla.1991), cited Kickliter for the principle that “forgery can result in disbarment.” Along with other misconduct, Solomon forged his deceased mother’s signature on a homestead tax exemption application and forged both of his deceased parents’ signatures on a homestead application the following year. Solomon was disbarred.
In Florida Bar v. Cramer, 678 So.2d 1278 (Fla.1996), Cramer forged another person’s signature on forms to lease computer and office equipment as part of a fraudulent scheme because Cramer was unable to obtain financing for the equipment. The Court stated:
Cramer perpetrated a fraud upon a financial institution. We have in the past recognized that a felony conviction for similar misconduct warranted disbarment. See Florida Bar v. Forbes, 596 So.2d 1051 (Fla.1992). Although Cram-er had not been criminally convicted for his actions at the time of this grievance proceeding, we conclude that his total conduct in this incident coupled with his prior disciplinary record evince a pat *1263 tern of misconduct warranting disbarment.
Id. at 1282. The Court disbarred Cram-er for his misconduct, including the forgery, which he committed in his personal business dealings. See also Fla. Bar v. Gold, 203 So.2d 324 (Fla.1967) (disbarring a respondent who engaged in forgery and recorded the forgery). Case law demonstrates that attorneys who engage in forgery can receive severe sanctions.
Accordingly, we find that the referee’s recommendation of a ninety-day suspension is unsupported. After considering the factual findings, the totality of misconduct, case law, and the Standards, we conclude that disbarment is the appropriate sanction.
CONCLUSION
Accordingly, we approve the referee’s findings of fact, recommendations of guilt, and award of costs. We disapprove the referee’s reliance on Standard 7.0 and instead apply Standard 5.0. Further, we disapprove the referee’s recommendation of a ninety-day suspension. Sherry Grant Hall is hereby disbarred from the practice of law in Florida, effective, nunc pro tunc, October 9, 2009. As Respondent is currently suspended, it is unnecessary to provide her with thirty days to close out her practice to protect the interests of existing clients.
Judgment is entered for The Florida Bar, 651 East Jefferson Street, Tallahassee, Florida 32399-2300, for recovery of costs from Sherry Grant Hall in the amount of $20,160.71, for which sum let execution issue.
It is so ordered.
CANADY, C.J., and LEWIS, POLSTON, LABARGA, and PERRY, JJ„ concur.
PARIENTE, J., concurs in part and dissents in part with an opinion, in which QUINCE, J., concurs.

. After the referee’s report was submitted, the Court issued an order scheduling oral argument and directing the parties to address why disbarment is not the appropriate sanction. *1255 In addition, the Court issued a separate order suspending Respondent from the practice of law "until further order of this Court, effective thirty days from the date of this order so that respondent can close out her practice and protect the interests of existing clients.” Thereafter, Respondent tiled a motion for rehearing regarding the suspension, which was denied.

. Respondent stated that she is not related to Joseph Grant.

. Respondent knew that Mr. Godwin had been diagnosed with Alzheimer’s disease. Thus, Respondent usually discussed property and business issues with Mrs. Godwin.

. The referee stated, without elaboration, that "the other violations were either withdrawn or inapplicable to this case.”

. Standard 7.0, "Violations of Other Duties Owed as a Professional,” applies to "cases involving false or misleading communication about the lawyer or the lawyer’s services, improper communication of fields of practice, improper solicitation of professional employment from a prospective client, [and] unreasonable or improper fees.” Standard 7.2 states that "[suspension is appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional and causes injury or potential injury to a client, the public, or the legal system.” The referee found Respondent was engaged in a personal transaction that was unrelated to her legal practice. Respondent did not offer her professional services to the Godwins and no legal fees were involved. Thus, the misconduct was in her personal capacity, not in her professional capacity. Accordingly, the referee's reliance on Standard 7.2 is misplaced. We disapprove the referee’s reliance on Standard 7.2.

. Neither party has challenged the referee's findings of fact, recommendations as to guilt, or award of costs. Accordingly, we approve the referee's findings, recommendations as to guilt, and award of costs without discussion.

. The referee stated on the record that Hall had "violated the rules of the Bar by harassing lots of people, writing these voluminous letters talking about how she was — she was somehow being harmed by Mr. and Mrs. God-win.” The referee specifically referred to the incident involving Cindy Godwin, stating that "after [Respondent] was told to cease and desist and to leave them alone. She called back and asked for Mrs. Godwin. That is harassment.”

. The Florida Bar may bring a disciplinary action against a respondent regardless of “whether the alleged misconduct constitutes a felony or misdemeanor” and "whether the respondent has been tried, acquitted, or convicted in a court for the alleged criminal offense.” See R. Regulating Fla. Bar 3-4.4, “Criminal misconduct.”