PER CURIAM.
We have for review a referee’s report recommending that Respondent Henry T. Swann, III, be found guilty of professional misconduct and suspended for ninety-one days. The Florida Bar has filed a petition for review of the report, asking the Court to disapprove the referee’s recommended sanction and instead disbar Swann from the practice of law. Respondent Swann has filed a cross-petition for review. We have jurisdiction. See art. V, § 15, Fla. Const. As discussed below, we approve the referee’s findings of fact and recommendations as to guilt. However, we disapprove the referee’s recommended discipline. We conclude that Swann’s extensive misconduct, and the often egregious nature of the misconduct, warrant disbarment.
FACTS
In April 2011, The Florida Bar filed a five-count complaint against Respondent Swann, alleging that he engaged in misconduct in violation of several of the Rules Regulating the Florida Bar (Bar Rules). A referee was appointed to consider the matter. Following a hearing, the referee submitted his report for the Court’s review, in which he makes the following findings and recommendations.
Count I
Count I involves Swann’s conduct as the personal representative for his father’s estate, of which Swann’s mother was the sole beneficiary. Beginning in 2003, Swann used $463,429 from his father’s estate to make several investments, particularly investments in four real estate properties. During the final hearing before the referee in this case, Swann testified that he borrowed this money from his mother as a personal loan. However, despite the large sum of money involved, Swann did not create any written documentation to memorialize the loan or its terms. Moreover, the referee found that at various times before the final hearing, Swann gave a different explanation for his use of the estate’s funds. In a letter he sent to the Bar responding to a Bar inquiry, Swann stated that, as the personal representative for his father’s estate, he was authorized to invest estate funds for the benefit of the beneficiary. Similarly, during a 2005 deposition that Swann gave during his divorce proceedings, he testified under oath that he invested the $463,429 on his mother’s behalf so that there would be sufficient funds for her continued care. Swann claimed that his investments had substantially increased his mother’s money. However, the referee found there was no evidence that Swann paid his mother (or his father’s estate) any of the profits from these real estate investments.
Swann repaid $400,000 to his father’s estate in August 2005. He claimed that the remaining $63,429 was used to pay his mother’s bills. However, the referee found that Swann’s assertion was not supported in the evidence; the estate’s account records do not reflect a deposit of $63,429.
As noted, Swann used the money from his father’s estate to purchase four investment properties. Significantly, the referee found that Swann structured these real estate transactions in such a way as to confuse true ownership of the money and assets involved. The first of these real estate investments occurred in April 2003. Swann used estate funds to purchase a property identified as the Coquina Key property. Swann purchased Coquina Key in the name of Beach Street Properties, a limited liability company that he wholly owned and controlled. Immediately after *1228 purchasing the property, Swann conveyed Coquina Key to himself individually. Thereafter, he used Coquina Key to obtain a personal loan from Washington Mutual Bank (the Washington Mutual loan).
Subsequently, in 2003 and 2004, Swann used funds from his father’s estate to purchase the second and third investment properties, known as Surf Club and Atlantic View, respectively. Swann purchased Surf Club in his own name; he purchased Atlantic View in the name of Beach Street Properties. Swann later sold both properties for a profit. During his deposition in his divorce case, Swann testified under oath that he credited the profits from the sale of the Surf Club property to his father’s estate. However, the referee found there was no evidence to substantiate this claim.
In June 2004, Swann sold Coquina Key (his first investment property). Swann acted as the closing agent for the sale. He received $32,055 in cash at the closing and took a wrap-around mortgage from the buyers for $535,000. The referee found that the existing Washington Mutual loan on Coquina Key had a clause providing that the mortgage held by Washington Mutual Bank was assumable only with the bank’s prior approval. Nonetheless, Swann did not notify Washington Mutual of the sale.
The Coquina Key buyers fully paid the wrap-around mortgage in May 2005. Although Swann should have used these funds to satisfy the Washington Mutual loan, he did not do so. Instead, in August 2005 Swann used proceeds from the sale of a separate property (the Ocean Hammock property) to pay the loan. The referee found that Swann misused the funds intended to satisfy the Washington Mutual loan for his own purposes and violated his fiduciary duties as closing agent.
In October 2004, Swann purchased the fourth investment property, the Ocean Hammock property, using at least some funds associated with his father’s estate. Swann purchased the property in his own name. He then used Ocean Hammock to secure a loan from the Bank of St. Augustine (the Bank of St. Augustine loan).
Subsequently, in July 2005, Swann sold Ocean Hammock to Green Ville, LLC, a limited liability corporation owned by Swann’s client, Christiane Martinot. Although the company was owned by Marti-not, it is clear that during this period Swann actually controlled the company and directed Martinot’s actions related to these real estate transactions. Swann did not notify Bank of St. Augustine that he transferred Ocean Hammock to Green Ville, LLC. Shortly after the property was transferred, Martinot, on behalf of Green Ville, executed a mortgage in favor of Swann’s father’s estate for $400,000, secured by Ocean Hammock. This was the first time that Swann took any action to secure the money he borrowed from the estate.
In August 2005, Swann prepared a subsequent deed transferring Ocean Hammock from Green Ville, LLC to K.R.H. Investments, LLC, a limited liability corporation owned and controlled by Swann; the Articles of Incorporation for the company name Swann’s girlfriend, Khadija Rhoualmi, as the registered agent and manager. Swann again failed to notify the Bank of St. Augustine of the transfer.
Immediately after Swann transferred the Ocean Hammock property to K.R.H. Investments, K.R.H. Investments sold the property to E.C.N. Properties, LLC (a company independent from Swann). Swann used some of the proceeds from the sale to pay off the Washington Mutual loan. He also used $400,000 from the pro *1229 ceeds to satisfy the mortgage on Ocean Hammock held by his father’s estate.
Based on these facts, the referee found that Swann, as personal representative for his father’s estate (and as attorney-in-fact for his mother), utilized estate funds as if they were his own and extensively commingled estate assets with his own in such a manner as to obscure true ownership of the investments and the profits from the investments. Swann’s actions had the potential, if not the actual effect, of jeopardizing the money needed for his mother’s care. Accordingly, the referee recommends that he be found guilty of violating the following Bar Rules: 8-4.3 (the commission by a lawyer of any act that is unlawful or contrary to honesty and justice, whether the act is committed in the course of the attorney’s relations as an attorney or otherwise, may constitute a cause for discipline); 4-1.7(a)[1] (a lawyer shall not represent a client if there is a substantial risk that the representation of one or more clients will be materially limited by the lawyer’s responsibilities to another client, a former client or a third person or by a personal interest of the lawyer); 4-3.4(a) (a lawyer shall not unlawfully obstruct another party’s access to evidence or otherwise unlawfully alter, destroy, or conceal a document or other material that the lawyer knows or reasonably should know is relevant to a pending proceeding); 4-8.4(a) (a lawyer shall not violate the Rules of Professional Conduct); 4-8.4(c) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation); and 4-8.4(d) (a lawyer shall not engage in conduct in connection with the practice of law that is prejudicial to the administration of justice).
Count II
Count II concerns Swann’s relationship with Khadija Rhoualmi, and his involvement in her actions to emotionally and financially exploit one of Swann’s clients, William Shelton. Rhoualmi is a Moroccan citizen; during the period of time at issue in this case, she was living in Florida. Swann met Rhoualmi in 2003 and hired her to clean his office. He also assisted Rhoualmi with her application for United States citizenship. The two took several trips together while Swann was married, including visits to the Virgin Islands, Las Vegas, and New Orleans. Swann has stated that he and Rhoualmi had an “adult relationship” during this period; the referee found that they were sexually involved.
In April 2005, Rhoualmi referred Shelton, who was seventy-one years old at the time and in poor physical and mental health, to Swann, purportedly for help with a zoning matter related to a nursery that Shelton owned (the nursery property). Shelton paid Swann $1,000 for his legal services.
About a week after meeting with Swann, Shelton suffered a medical emergency that resulted in his hospitalization. Shortly after he was released from the hospital, on May 6, 2005, Shelton executed a warranty deed transferring his home from himself to both himself and Rhoualmi as joint tenants with rights of survivorship. On the face of the deed are notations indicating that it was “prepared by Henry Swann,” that it was recorded on May 9, 2005, and that the *1230 recording fees totaled $27.70. The Bar presented a copy of a check drawn from Swann’s law office account, dated May 9, 2005, payable to the clerk of court for $27.70. Although Swann claimed that he did not prepare the deed or the check, and that his secretary must have prepared them for Rhoualmi and Shelton without his involvement, the referee rejected his explanation as lacking credibility. The referee found that Swann prepared the check himself.
Shelton was hospitalized again in late May 2005. Several days after his release, on June 1, 2005, Shelton executed a deed conveying his nursery property from himself to both himself and Rhoualmi as joint tenants with rights of survivorship. Although the June 2005 deed does not indicate who prepared it, the form appears identical to the one recorded on May 9, 2005.
In July 2005, Shelton underwent a medical procedure. One day after he was released from the hospital, Rhoualmi drove Shelton to the bank where he added her name to his checking account and a certificate of deposit. Rhoualmi then withdrew virtually all of the money from the account and deposited the funds into a checking account solely in her name.
Later that month, Rhoualmi left the country for Europe. While she was out of the country, Shelton’s son hired a lawyer, Harold Lippes, to bring civil cases to freeze Rhoualmi’s checking account and rescind the two deeds. When Swann learned of these proceedings, he flew to Spain for several days and met with Rhoualmi.
Rhoualmi returned from Europe in August 2005 and resumed her relationship with Shelton. The two sought and obtained a marriage license. Thereafter, Rhoualmi attempted to have Shelton sign a prenuptial agreement. The referee found that the prenuptial agreement Rhoualmi proposed was extremely one-sided in her favor. It would have provided that Shelton’s nursery property be listed for sale with Fun Coast Realty, LLC.; at the time, Swann had a real estate license registered with Fun Coast Realty. This version of the prenuptial agreement was never signed.
On November 18, 2005, Rhoualmi and Shelton were married. Several months later, Shelton was declared incompetent to make financial and legal decisions. He passed away in August 2006. Ultimately, the Fourth Judicial Circuit Court entered a final judgment in In re Estate of Shelton, Case No.2006-CP-1845 (the Shelton case), which annulled the marriage between Shelton and Rhoualmi, ordered Rhoualmi to return the funds she withdrew from Shelton’s account, and rescinded the two warranty deeds for his home and nursery properties. The circuit court’s order makes a number of findings regarding Swann’s involvement in the matter. In relevant part, the circuit court found that Rhoual-mi’s “real intention was to obtain Shelton’s money and property” and that “[s]he accomplished this, in part, with the active assistance of Henry T. Swann, III (‘Swann’), an attorney with whom she became romantically involved by mid-2004.” In re Estate of Shelton, Case No. 2006-CP-1845 (Fla. 4th Cir. order entered Nov. 16, 2007) (emphasis added).
Based on these facts, the referee recommends that Swann be found guilty of violating the following Bar Rules: 3-4.3 (the commission by a lawyer of any act that is unlawful or contrary to honesty and justice, whether the act is committed in the course of the attorney’s relations as an attorney or otherwise, may constitute a cause for discipline); 4-1.7(a) (a lawyer shall not represent a client if there is a substantial risk that the representation of *1231 one or more clients will be materially limited by the lawyer’s responsibilities to another client, a former client or a third person or by a personal interest of the lawyer); 4-5.3(b) (providing that a lawyer having direct supervisory authority over a nonlawyer shall make reasonable efforts to ensure that the person’s conduct is compatible with the professional obligations of the lawyer); 4-8.4(a) (a lawyer shall not violate the Rules of Professional Conduct); and 4-8.4(d) (a lawyer shall not engage in conduct in connection with the practice of law that is prejudicial to the administration of justice).
Count III
Count III involves Swann’s conduct during his divorce proceedings. Swann and his wife separated in May 2005. Thereafter, the evidence demonstrates that Swann took actions prior to and during his divorce case designed to obscure and conceal marital assets from his wife and her attorneys. The referee found that Swann titled marital properties in a manner intended to defraud his wife. For example, he transferred the Ocean Hammock property from his own name to Green Ville, LLC, and later from Green Ville to K.R.H. Investments, solely to prevent his wife and her attorneys from filing a lis pendens against the property. Swann then sold the Ocean Hammock property without informing his wife. In addition, the referee found that Swann transferred some marital properties into his sister’s name; Swann concealed his actions from his sister by having the deeds sent to his own address.
The attorney for Swann’s wife filed a sworn affidavit in these disciplinary proceedings stating that he was required to perform extensive legal work to identify and protect marital assets. The attorney stated that he filed multiple lis pendens against properties held by Swann’s various companies. Indeed, at one point it was necessary for Swann’s wife to pursue civil actions against Swann’s girlfriend, Khadija Rhoualmi, his client, Christiane Martinot, and his sister in order to secure marital property. Although Swann argued that he eventually transferred all of the disputed properties back into his own name, the referee found that Swann took this step only after his actions had been exposed. Swann’s conduct caused his wife to incur additional attorney’s fees and costs.
The referee further found that Swann’s wife and her attorneys made reasonable efforts to schedule Swann for a deposition in the divorce case, without success. Swann did not file required financial information in advance of a temporary support hearing held in the case. Following that hearing, the circuit court entered a Temporary Support Order finding that Swann’s testimony was evasive, that he was not a credible witness, and that his finances were “murky.”
In June 2005, Swann applied for a home equity line of credit, secured by the marital home, with a maximum limit of $150,000. Swann signed his wife’s signature on the loan application. Thereafter, he obtained $150,000 from the line of credit and deposited the funds into his personal checking account. Swann then wrote a check for $150,000 payable to John Zolsky, his friend and the owner of Fun Coast Realty. Zolsky used the funds to purchase the mortgage on Swann’s law office condominium. Pursuant to an earlier separation agreement between Swann and his wife, Swann was required to use the home equity loan to keep the mortgage on the couple’s marital home current; contrary to this agreement, the referee found that Swann used the funds without his wife’s permission to eliminate his personal debts.
Finally, the referee found that Swann’s actions during the divorce case defrauded a lender. In June 2005, Swann purchased *1232 a property known as the San Mateo house using at least some marital funds. He bought the property in the name of First Coast Land and Title, LLC, a limited liability corporation owned and controlled by Swann; as with other companies Swann controlled, the Articles of Incorporation for First Coast Land and Title named Khadija Rhoualmi as the registered agent and manager. Subsequently, First Coast Land and Title conveyed the San Mateo property to K.R.H. Investments. The referee found that Swann transferred the property shortly before his wife’s attorney recorded a lis pendens on the property; as a result, the attorney filed the lis pendens against the wrong property owner. Swann then sought and obtained a loan secured by the San Mateo house, knowing that his wife had filed the lis pendens (against the wrong owner). Swann did not advise the bank of the existence of the lis pendens. The referee found that, as the result of Swann’s material omission, the lender made the loan believing that the San Ma-teo property was free of encumbrances.
Based on Swann’s actions in the divorce case, the referee recommends that Swann be found guilty of violating the following Bar Rules: 3^.3 (the commission by a lawyer of any act that is unlawful or contrary to honesty and justice, whether the act is committed in the course of the attorney’s relations as an attorney or otherwise, may constitute a cause for discipline); 4-3.4(a) (a lawyer shall not unlawfully obstruct another party’s access to evidence or otherwise unlawfully alter, destroy, or conceal a document or other material that the lawyer knows or reasonably should know is relevant to a pending proceeding); 4-8.4(e) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation); and 4-8.4(d) (a lawyer shall not engage in conduct in connection with the practice of law that is prejudicial to the administration of justice).
Count IV
Count IV concerns Swann’s involvement in business transactions with clients, particularly his client, Christiane Martinot. Swann originally formed the company Green Ville, LLC on Martinot’s behalf, for her own real estate business. However, during the period of time at issue, Swann maintained control over the corporation. Martinot provided an affidavit in this case, in which she stated that Swann asked her to hold some of his investment properties and money in Green Ville because he told her he was going through an “ugly divorce” and “his wife was trying to take everything he had.” At Swann’s request, Martinot agreed to sign various papers and checks for the Green Ville account. She also executed a mortgage on behalf of Green Ville in favor of Swann’s father’s estate, secured by the Ocean Hammock property. Martinot stated that Swann’s actions caused her to have concerns regarding her potential tax liabilities. His actions also led to Martinot being joined in Swann’s divorce case.
In count IV, the referee recommends that Swann be found guilty of violating the following Bar Rules: 3-4.3 (the commission by a lawyer of any act that is unlawful or contrary to honesty and justice, whether the act is committed in the course of the attorney’s relations as an attorney or otherwise, may constitute a cause for discipline); 4-1.1 (a lawyer shall provide competent representation to a client); 4-1.7(a) (a lawyer shall not represent a client if there is a substantial risk that the representation of one or more clients will be materially limited by the lawyer’s responsibilities to another client, a former client or a third person or by a personal interest of the lawyer); 4-1.8(a) (a lawyer shall not enter into a business with a client unless the transaction is fair and reasonable to *1233 the client and fully disclosed in writing; the client is advised in writing of the desirability of seeking independent legal counsel; and the client gives informed written consent); 4-8.4(a) (a lawyer shall not violate the Rules of Professional Conduct); 4-8.4(c) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation); and 4-8.4(d) (a lawyer shall not engage in conduct in connection with the practice of law that is prejudicial to the administration of justice).
Count V
Count V concerns Swann’s actions as the co-personal representative for the estate of his client, Natalia Berwick Taylor, and as the trustee for the Natalia Berwick Taylor Trust (the Taylor Trust). Taylor hired Swann in 1998 to prepare a Declaration of Trust for the Taylor Trust. Ten years later, in 2003, Swann prepared a will for Taylor that named Swann and another person as co-personal representatives for her estate. Swann also prepared a revised trust and a first amendment to the Taylor trust, which named Swann as the sole trustee.
Taylor passed away in October 2005, and Swann filed the will for probate. At that time, one of the assets in Taylor’s estate was her home (the Taylor home). The referee found that Swann allowed Khadija Rhoualmi, and later a client, to live in the Taylor home either rent free or paying rent in an amount below fair market value. The referee also found that Swann did not fully inform the estate and trust beneficiaries of this arrangement.
Additionally, Swann failed to provide the Taylor Trust beneficiaries with a timely accounting of trust assets. Harold Lippes, the attorney for Shelton, became involved in this matter when he learned that Rhoualmi was living in the Taylor home. Lippes testified that he spoke with the trust beneficiaries and learned that Swann’s communications with them had been poor. Lippes agreed to represent the trust beneficiaries pro bono. On May 12, 2006, he sent a letter demanding that Swann provide a full accounting and that he withdraw as trustee. On May 15, Swann provided an interim accounting. The trust and will beneficiaries ultimately reached an agreement, and Swann was discharged as trustee.
Based on these facts, the referee recommends that Swann be found guilty of violating the following Bar Rules: 8-4.3 (the commission by a lawyer of any act that is unlawful or contrary to honesty and justice, whether the act is committed in the course of the attorney’s relations as an attorney or otherwise, may constitute a cause for discipline); 4-1.1 (a lawyer shall provide competent representation to a client); 4-1.7(a) (a lawyer shall not represent a client if there is a substantial risk that the representation of one or more clients will be materially limited by the lawyer’s responsibilities to another client, a former client or a third person or by a personal interest of the lawyer); and 4-8.4(d) (a lawyer shall not engage in conduct in connection with the practice of law that is prejudicial to the administration of justice).
Recommendation as to Discipline
The referee found five aggravating factors in this case: (1) a dishonest or selfish motive; (2) a pattern of misconduct; (3) multiple offenses; (4) vulnerability of the victim (in that Swann’s mother was elderly and may not have been sufficiently competent to approve his use of the estate funds, and Shelton was particularly vulnerable due to his mental incapacity); and (5) substantial experience in the practice of law. The referee found one mitigating factor, the absence of a prior disciplinary record.
*1234 Based on his recommendations as to guilt, the findings in aggravation and mitigation, and his consideration of the Florida Standards for Imposing Lawyer Sanctions and case law, the referee recommends that Swann be suspended from the practice of law for ninety-one days. The referee also awarded costs to The Florida Bar, in the amount of $16,327.05.
As noted, the Bar has filed a petition for review, challenging the referee’s recommended sanction. Swann has filed a cross-petition for review, in which he urges the Court to approve the referee’s recommended ninety-one-day suspension; however, Swann also argues that the referee did not consider his “explanations and mitigating circumstances.”
ANALYSIS
The Referee’s Findings of Fact and Recommendations as to Guilt
First, to the extent that Swann’s cross-petition for review challenges the referee’s findings of fact, we hold that such facts are supported by competent, substantial evidence in the record. See Fla. Bar v. Frederick, 756 So.2d 79, 86 (Fla.2000) (stating that when the referee’s findings are supported by “competent, substantial evidence in the record,” this Court is “precluded from reweighing the evidence and substituting [our] judgment for that of the referee”) (quoting Fla. Bar v. Lange, 711 So.2d 518, 520 n. 5 (Fla.1998)); see also Fla. Bar v. Jordan, 705 So.2d 1387, 1390 (Fla.1998). Swann’s argument that the referee did not consider his “explanations and mitigating circumstances” is, in essence, a challenge to the referee’s weighing of the evidence and his assessment of credibility — Swann contends the referee should have accepted his testimony, evidence, and explanations over that of the Bar’s evidence. However, as we stated in Frederick, if the factual findings are supported by competent substantial evidence, this Court will not reweigh the evidence presented to the referee. Moreover, the Court has long held, “The referee is in a unique position to assess the credibility of witnesses, and his judgment regarding credibility should not be overturned absent clear and convincing evidence that his judgment is incorrect.” Fla. Bar v. Tobkin, 944 So.2d 219, 224 (Fla.2006) (quoting Fla. Bar v. Thomas, 582 So.2d 1177, 1178 (Fla.1991)). Here, Swann has not demonstrated that the referee’s factual findings are unsupported or that his credibility assessments are incorrect. Accordingly, we approve the referee’s findings of fact without further discussion.
We also approve the referee’s recommendations as to guilt. Initially, we note that Swann’s cross-petition for review asks the Court to approve the referee’s recommended discipline. Thus, we conclude that Swann has, in effect, waived any argument challenging the referee’s recommendations as to guilt. Even if Swann had not waived the issue, we would nonetheless conclude that the referee’s findings of fact are sufficient to support the recommendations as to guilt. See Fla. Bar v. Shoureas, 913 So.2d 554, 557-58 (Fla.2005) (“[T]he referee’s factual findings must be sufficient under the applicable rules to support the recommendations as to guilt.”). The referee’s factual findings show that Swann’s actions, both in his personal matters and in his practice of law, were dishonest, self-serving, and prejudicial to justice. As the referee observed, conduct such as that engaged in by Swann taints how the legal profession is viewed by members of the public and by people who seek the professional services of an attorney. We have stated that “attorneys must be and are held to the highest of ethical standards and, unlike non-attorney citizens, are subject to discipline for a *1235 breach of those standards.” Fla. Bar v. Brown, 905 So.2d 76, 82 (Fla.2005). We address some of the most egregious of Swann’s ethical violations here.
In count I, addressing Swann’s conduct as the personal representative of his father’s estate, the referee found Swann guilty of violating several Bar Rules, including rules 3-4.3 and 4-8.4(c). Rule 3-4.3 provides: “The commission by a lawyer of any act that is unlawful or contrary to honesty and justice, whether the act is committed in the course of the attorney’s relations as an attorney or otherwise ... may constitute a cause for discipline.” Similarly, rule 4-8.4(c) states that a lawyer shall not “engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.” We conclude that the referee made numerous factual findings in count I that support his recommendation that Swann be found guilty of violating these rules. Most notably, the referee found that Swann’s testimony during his divorce proceedings and his testimony before the referee in this case, both given while under oath, were directly contradictory. During his divorce case, Swann testified in a deposition that he invested estate funds solely for his mother’s benefit. However, before the referee, he testified that the money was a personal loan. It is clear to this Court that Swann varied his sworn testimony to suit his own purposes in each case. Additionally, in count I the referee found that Swann used estate funds for various real estate transactions and structured the transactions to obscure the true ownership of the money and property involved; that although he refunded his father’s estate $400,000 from the total $463,429 used, there is no evidence that he repaid the estate the remaining $63,429; that Swann did not notify Washington Mutual Bank when he sold the Coquina Key property, even though he was obligated to do so under the terms of the loan; and that he failed to repay Washington Mutual Bank with the funds he received from the Coquina Key buyers, as required by the terms of the closing statement. Based on these factual findings, we conclude that the referee’s recommendations that Swann be found guilty of violating rules 3-4.3 and 4-8.4(c) are well supported.
Also in count I, the referee found that Swann created conflicts of interest in violation of rule 4-1.7(a). The rule provides that a lawyer shall not represent a client if there is a substantial risk that the lawyer’s representation of the client will be “materially limited by the lawyer’s responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.” We conclude that the factual findings are sufficient to support the referee’s conclusion that Swann’s independent professional judgment was materially limited by his own personal interests, in violation of this rule. Swann, while serving as the personal representative for his father’s estate and the attorney for his mother, used money from the estate for his own purposes and failed to protect the estate from the potential consequences of his actions. As noted, Swann has presented two conflicting explanations for his use of the estate money. To the extent he claims the funds were a loan from his mother, the referee found that Swann borrowed a large sum of money and did not act to protect the estate by reducing the loan terms to writing. Alternatively, to the extent he claims he invested the money on behalf of the estate, Swann purchased all of the investment properties in his own name or in the name of corporations he controlled. In fact, the referee found that the October 2004 mortgage in favor of his father’s estate secured by the Ocean Hammock property was the only time that Swann took any action to secure the mon *1236 ey he borrowed from the estate. Moreover, although Swann’s investments apparently made a profit, he did not share any of these profits with the estate. Based on these findings of fact, we conclude that the referee’s recommendation that Swann be found guilty of violating rule 4-1.7 is well supported.
Turning to count II, the referee found that Swann helped his girlfriend, Khadija Rhoualmi, to exploit an elderly client. This count may involve the most egregious instances of Swann’s misconduct. The referee found Swann guilty of violating several Bar Rules in count II, including that he engaged in dishonest conduct in violation of rule 3^4.3. We approve this recommendation as to guilt. Swann’s conduct was plainly contrary to honesty and justice. Swann and Rhoualmi had an ongoing personal “adult relationship.” At the same time, Swann knew that Rhoualmi was also involved in a relationship with his client, Mr. Shelton. Both the referee and the Fourth Judicial Circuit in the Shelton case found that Swann assisted Rhoualmi in exploiting Shelton and taking his property and money. Among other things, Rhoualmi convinced Shelton to transfer his home and his nursery property from himself to both himself and Rhoualmi jointly. The evidence indicates that Swann prepared the deeds transferring these properties and that he paid the recording fees. When Rhoualmi left the country in July 2005, Swann flew to Spain to meet with her and update her on the pending civil case. The referee further found that Swann continued to act in concert with Rhoualmi throughout the course of that litigation. Based on these findings, we agree with the referee’s conclusion that, not only was Swann aware of Rhoual-mi’s actions, he actively assisted her in carrying them out.
In count III, concerning Swann’s conduct in his divorce case, the referee recommends that Swann be found guilty of violating a number of Bar Rules, including dishonest conduct in violation of rules 3-4.3 and 4-8.4(c). We conclude that the referee’s factual findings support this recommendation. Swann took deliberate actions to conceal marital assets from his wife; he signed his wife’s name to an application for a home equity line of credit without informing the lender; he used the proceeds from the line of credit to satisfy his personal debts, namely his law office condominium, in violation of the couple’s separation agreement; and he transferred the San Mateo house from one of his companies to another, solely to avoid his wife filing a lis pendens against the property. Also in count III, the referee found that Swann sought and obtained a loan from Bank of America, secured by the San Ma-teo house, knowing that his wife had filed the lis pendens. Swann did not advise the bank of the existence of the lis pendens, even though he knew it would not appear in a public records search and, as a result, the lender made the loan believing that the San Mateo property was free of encumbrances. We conclude that these factual findings are sufficient to support the referee’s recommendations in count III that Swann be found guilty of violating rules 3-4.3 and 4-8.4(c).
In count IV, the referee found, among other things, that Swann engaged in business transactions with his clients in violation of Bar Rule 4-1.8(a). That rule provides that a lawyer shall not enter into a business transaction with a client unless: (1) the terms of the transaction are fair and reasonable to the client and are fully disclosed to the client in writing; (2) the client is advised in writing of the desirability of seeking the advice of independent legal counsel, and is given a reasonable *1237 opportunity to do so; and (3) the client gives informed written consent to the essential terms of the transaction and the lawyer’s role in the transaction. We agree with the referee’s conclusion that Swann engaged in business transactions with his clients, particularly with Christiane Marti-not, and that he failed to make the required disclosures. Swann established Green Ville, LLC for Martinot to use for her own real estate business. Nonetheless, during the period of time at issue in this case, Swann maintained total control over the corporation. He also directed Martinot’s actions regarding the company. Martinot stated in her affidavit that Swann asked her to hold some of his investment properties and money in Green Ville in order to conceal those assets from his wife. She also stated that Swann asked her to sign various papers and checks. In fact, Martinot, on behalf of Green Ville, executed a mortgage in favor of Swann’s father’s estate secured by the Ocean Hammock property. It is not disputed that Swann failed to make any of the written disclosures to Martinot that are required under rule 4-1.8. Moreover, his actions caused Martinot to fear whether she would have tax liabilities based on these transactions, and ultimately led to her being named in his divorce proceeding. Accordingly, we approve the referee’s recommendation that Swann be found guilty of violating Bar Rule 4-1.8(a).
Finally, count V addresses Swann’s actions as the co-personal representative for the Taylor estate and as the trustee for the Taylor Trust. As with counts I through IV, the referee found Swann guilty of violating several Bar Rules, including rule 3-4.3. In support of this recommendation, the referee found that Swann used an asset of the Taylor estate, the Taylor home, to benefit his girlfriend, Khadija Rhoualmi. Swann allowed Rhoualmi, and later a client, to live in the Taylor home for a rent below the market value. He did not fully advise the estate beneficiaries of this arrangement, and the evidence indicates that he did not fully account for the rental income he earned. Based on these facts, we approve the referee’s recommendation that Swann be found guilty of violating Bar Rule 3-4.3.
In sum, we have considered the referee’s findings of fact, and we conclude that such findings are sufficient to support the recommendations as to guilt. Accordingly, we approve those recommendations in full.
The Referee’s Recommended Sanction
We turn next to the referee’s recommended sanction, a ninety-one-day suspension. In reviewing a referee’s recommended discipline, this Court’s scope of review is broader than that afforded to the referee’s findings of fact because, ultimately, it is the Court’s responsibility to order the appropriate sanction. See Fla. Bar v. Anderson, 538 So.2d 852, 854 (Fla.1989); see also Art. V, § 15, Fla. Const. However, generally speaking this Court will not second-guess the referee’s recommended discipline as long as it has a reasonable basis in existing case law and the Florida Standards for Imposing Lawyer Sanctions. See Fla. Bar v. Temmer, 753 So.2d 555, 558 (Fla.1999).
The Bar urges the Court to disapprove the referee’s recommended sanction, and instead disbar Swann from the practice of law. After considering the numerous instances of Swann’s misconduct in this case, and the often egregious nature of the misconduct, we agree. As discussed below, we conclude that disbarment is the appropriate sanction.
The report of referee indicates that the referee considered several of the Florida Standards for Imposing Lawyer Sanctions in making his recommendation as to discipline. Among the Standards considered, *1238 we particularly note Standard 7.1, which provides that disbarment is appropriate when a lawyer intentionally engages in conduct that is a violation of a duty owed as a professional with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public, or the legal system. As discussed herein, Swann’s conduct in this case was often taken to benefit himself at the expense of others.
In addition to the Standards, case law demonstrates that disbarment is appropriate. Many of Swann’s actions, standing alone, would warrant at least a rehabilitative suspension. See, e.g., Fla. Bar v. Baker, 810 So.2d 876 (Fla.2002) (suspending an attorney for ninety-one days for forging his former wife’s signature on legal documents relating to the sale of their home in Dade County); Fla. Bar v. Cibula, 725 So.2d 360 (Fla.1998) (suspending an attorney for ninety-one days for misrepresenting his income to the court during his divorce and alimony proceedings in order to induce the court to modify the alimony payment); Fla. Bar v. Langston, 540 So.2d 118 (Fla.1989) (suspending an attorney for ninety-one days for, among other violations, transferring marital property out of his name in violation of a court order entered in his dissolution of marriage proceeding); Fla. Bar v. Collier, 506 So.2d 389 (Fla.1987) (suspending an attorney for six months, where the referee found that the attorney and his wife convinced his wife’s father, who was not competent to make legal and financial decisions, to execute a waiver of his interest in a trust; the effect of the waiver would have been that the corpus of the trust passed immediately to the respondent’s wife, and her father would be left with no significant assets for his care).
In this case, Swann’s various acts of misconduct must be considered together as a whole. Swann engaged in twenty-six separate rule violations, spanning a period of several years. Some of his conduct, especially his involvement with Ms. Rhoualmi to exploit his client, Mr. Shelton, is particularly serious. Swann’s extensive and egregious misdeeds warrant a more severe sanction than the ninety-one-day suspension recommended by the referee.
Moreover, every count described in the referee’s report involves some instance of Swann’s dishonest and deceitful conduct. Our prior decisions have made clear that basic fundamental dishonesty is a serious flaw, one which cannot be tolerated by a profession that relies on the truthfulness of its members. Fla. Bar v. Rotstein, 835 So.2d 241, 246 (Fla.2002); Fla. Bar v. Korones, 752 So.2d 586, 591 (Fla.2000). We conclude that Swann’s numerous acts of dishonest conduct, together with his other serious ethical violations, warrant disbarment.
Finally, the fact that much of the misconduct in this case involves Swann’s personal affairs does not change our conclusion that disbarment is warranted. This Court has long held that ethical violations which occur while a member of The Florida Bar is not acting as an attorney can nonetheless subject the attorney to disciplinary proceedings.
As this Court has stated before, “an attorney is an attorney is an attorney.” Even in personal transactions and when not acting as an attorney, attorneys must avoid tarnishing the professional image or damaging the public.... The practice of law is a privilege which carries with it responsibilities as well as rights. That an attorney might, as it were, wear different hats at different times does not mean that professional ethics can be “checked at the door” or that unethical or unprofessional conduct *1239 by a member of the legal profession can be tolerated.
Fla. Bar v. Della-Donna, 583 So.2d 307, 310 (Fla.1989) (citations and internal quotation marks omitted). This Court has previously imposed lengthy suspensions or disbarment when attorneys engage in dishonest conduct in their personal matters. See, e.g., Fla. Bar v. Draughon, 94 So.3d 566, 571 (Fla.2012) (suspending an attorney for one year for defrauding the former property owner in a real estate transaction) (“Although Draughon was acting on behalf of his own corporation, and not as a lawyer representing a client in a transaction, he is nonetheless a member of The Florida Bar and subject to the disciplinary authority of this Court. The Court expects members of the Bar to conduct their personal business affairs with honesty and in accordance with the law.”) (citation and internal quotation marks omitted); Fla. Bar v. Hall, 49 So.3d 1254 (Fla.2010) (disbarring an attorney for harassing property owners who refused the attorney’s offer to buy their property and creating a false agreement for sale). In Hall, the Court expressly noted that Hall “purposefully used her knowledge of the law to harm others, for her own personal benefit.” Id. at 1258. Similarly, in this case, we conclude that Swann used his knowledge of the law to manipulate others.
Ultimately, based upon Swann’s numerous acts of dishonest conduct, together with the aggravating[2] and mitigating[3] factors found by the referee, we conclude that disbarment is warranted. Thus, we disapprove the referee’s recommended sanction, a ninety-one-day suspension, and instead disbar Swann.
CONCLUSION
Accordingly, Henry T. Swann, III, is hereby disbarred from the practice of law in Florida. The disbarment will be effective thirty days from the filing of this opinion so that Swann can close out his practice and protect the interests of existing clients. If Swann notifies this Court in writing that he is no longer practicing and does not need the thirty days to protect existing clients, this Court will enter an order making the suspension effective immediately. Swann shall fully comply with Rule Regulating the Florida Bar 3-5.1(h). Further, Swann shall accept no new business from the date of this opinion.
Judgment is entered for The Florida Bar, 651 East Jefferson Street, Tallahassee, Florida 32399-2300, for recovery of costs from Henry T. Swann, III, in the amount of $16,327.05, for which sum let execution issue.
It is so ordered.
POLSTON, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, LABARGA and PERRY, JJ., concur.

. In counts I, II, IV, and V, the referee recommends that the Court find Swann guilty of violating Bar Rule 4-1.7(b). The reference to subdivision (b) appears to be a scrivener’s error. The referee stated that Swann was guilty of violating the rule that provides, “A lawyer shall not represent a client if the lawyer’s exercise of independent professional judgment in the representation of that client may be materially limited by the lawyer’s responsibilities to another client or to a third person or by the lawyer’s own interest.” This conduct is prohibited under Bar Rule 4-1.7(a)(2).

. As noted, the referee found five aggravating factors, including dishonest or selfish motive; a pattern of misconduct; multiple offenses; vulnerability of the victim; and substantial experience in the practice of law. Swann does not challenge these findings. We approve the referee’s findings without further discussion.

. The referee found one mitigating factor, the absence of a prior disciplinary history. Although Swann suggests that the referee should have considered other mitigating circumstances, he declined to present mitigating evidence to the referee. Accordingly, we approve the referee’s findings in mitigation without further discussion.